**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANGELA JOAQUIN, <br><br> Plaintiff, <br><br> v. <br><br> LONSTEIN LAW OFFICES, P.C., et al., <br><br> Defendants. | Civil Action No. 15-8194 (MAS) (DEA) <br><br> **MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon Defendants Lonstein Law Offices, P.C. ("LLO"), Wayne Lonstein, and Julie Cohen Lonstein's (the "Lonstein Defendants") Motion for Summary Judgment (ECF No. 199) and Signal Auditing, Inc. ("SAI") and Steven Levine's (the "Signal Defendants") (the Lonstein Defendants and the Signal Defendants, collectively, "Defendants") Motion for Summary Judgment (ECF No. 204) seeking dismissal of the Second Amended Complaint's NJRICO claim (Second Am. Compl. ("SAC"), ECF No. 59).[1] Plaintiff Angela Joaquin ("Plaintiff" or "Joaquin") opposed (ECF No. 207), and Defendants replied (ECF Nos. 208, 210.) For the reasons set forth herein, the Court grants Defendants' Motions for Summary Judgment and dismisses all counts of the Second Amended Complaint.

---

[1] Count One of the Second Amended Complaint alleges a violation of the Consumer Fraud Act, while Count Two alleges an NJRICO claim. The Court dismissed Count One in an earlier opinion. (*See* June 2017 Op. 1-2, ECF No. 79.)

1

## I. BACKGROUND

### A. Undisputed Facts Regarding the Salon

In 2004, Plaintiff "opened Angela's Salon and Supplies (the "Salon")[,] . . . a hair salon that also sells beauty products." (Lonstein's Statement of Material Undisputed Facts ("LMF") ¶ 10, ECF No. 202; Joaquin's Resp. to LMF ("JRMF") ¶ 10, ECF No. 207-5.) Upon the opening of the Salon "in 2004, Plaintiff had two televisions installed inside for customers to watch." (LMF ¶ 13; JRMF ¶ 13.) Plaintiff opened a "Verizon account in the name of 'Angela's Salon Supplies'" and received Verizon services at the time of the opening of the Salon. (LMF ¶ 18 (citing Apr. 16, 2018 Joaquin Dep. Tr. ("Joaquin Dep.") 89:6-15); JRMF ¶ 18.) At the time of installation, when asked what the services were for, Plaintiff replied, "Angela Salon Supplies." (LMF ¶ 20; JRMF ¶ 20.) Plaintiff changed her Verizon plan in 2007 "in order to take advantage of discounts and promotions." (LMF ¶ 24; JRMF ¶ 24.) Plaintiff "received an account summary from Verizon dated August 14, 2007" in or about the same month. (LMF ¶ 27; JRMF ¶ 27.) This account summary listed a handful of services removed from the account, including "Verizon Freedom for Business" and "Message Rate Services – Business." (LMF ¶¶ 31-32; JRMF ¶¶ 31-32.)

In or around "November 2010, Plaintiff began receiving Verizon Triple Play Services," which "includes phone services, internet services, and DirecTV television services" from Verizon at the Salon. (LMF ¶¶ 36-37; JRMF ¶¶ 36-37.). Plaintiff signed a document "for the Triple Play package so they can bring DirecTV [to the Salon] . . . ." (LMF ¶ 40 (quoting Joaquin Dep. 88:18-19); JRMF ¶ 40.) Plaintiff received all Verizon services henceforth in her personal name, not "in the name of 'Angela's Salon Supplies,'" and knew that the Verizon invoices were in her name personally. (LMF ¶¶ 42-44; JRMF ¶¶ 42-44.). A DirecTV employee installed the

dish at the Salon on "[t]he day after Joaquin signed the Verizon contract," and Plaintiff thereafter "signed a document saying the job had been completed." (LMF ¶¶ 45-46; JRMF ¶¶ 45-46.)

Plaintiff received a letter dated November 26, 2012 stating: "Verizon Freedom Essentials is for residential customers. Offer is for residential voice use only. It is not available for business customers. If you use the service for non-residential voice purposes, Verizon Long Distance, after notifying you, will change your plan to the Verizon Talk Time 30 Plan." (LMF ¶ 49; JRMF ¶ 49.) Plaintiff received a letter, dated November 19, 2013, which included an agreement ("DirecTV Customer Agreement") with the following notice:

> This describes the terms and conditions of your receipt and payment of DirecTV® service and is subject to arbitration (Section 9) and disclaimer of warranties (Section 8). If you do not accept these terms, please notify us immediately and we will cancel your service. If you instead decide to receive our service, it will mean that you accept these terms and they will be legally binding . . . .

(LMF ¶ 51 (alteration in original) (emphasis omitted) (quoting DirecTV Customer Agreement at *11, Exhibit D-7 to Spiegel Decl., ECF No. 199-8[2]); JRMF ¶ 51.) The DirecTV Customer Agreement provides, in Section 1(h), that:

> <u>Private Viewing.</u> We provide Service only for your private non-commercial use, enjoyment and home viewing. The program may not be viewed in areas open to the public or in commercial establishments. You may not rebroadcast, transmit or perform the programming charge admission for its viewing or transmit or distribute running accounts of it. You may not use any of our trademarks. Notwithstanding the provisions of Section 9, we or any programming provider may prosecute violations of the foregoing against you and other responsible parties in any court of competent jurisdiction, under the rules and regulations of the Federal Communications Commission and other applicable laws.

---

[2] Page numbers preceded by an asterisk refer to the page number on the ECF header.

3

(LMF ¶ 52 (quoting DirecTV Customer Agreement at *13); JRMF ¶ 52) The reverse side of the November 19, 2013 Letter states: "CUSTOMER OFFER TERMS AND CONDITIONS. Please refer to your DirecTV Lease Addendum for all Terms and Conditions regarding your leased equipment. By placing this order you agree to the following terms: You are a current residential DirecTV customer . . . ." (LMF ¶ 55 (quoting November 19, 2013 Correspondence at *25, Exhibit D-7 to Spiegel Decl.); JRMF ¶ 55.) Plaintiff canceled Triple Play "at some point" but continued to receive television services provided by DirecTV. (LMF ¶ 59; JRMF ¶ 59.) Plaintiff displayed DirecTV to her customers during the Salon's business hours "[f]rom November 2010 until DirecTV was disconnected in 2015." (LMF ¶¶ 62-63; JRMF ¶¶ 62-63.)

### B. Undisputed Facts Regarding SAI

DirecTV is a client of Lonstein Law Offices ("LLO") and has been represented by LLO "in connection with anti-piracy and commercial misuse of services" since the early 2000s. (LMF ¶ 64; JRMF ¶ 64.) LLO had previously relied on third-parties to "create reports documenting alleged commercial misuse in connection with its broadcast rights matters," but in 2001, "J. Lonstein, W. Lonstein, and Levine created [SAI] . . . ." (LMF ¶¶ 66-68; JRMF ¶¶ 66-68.) SAI generally audits "places that are open to the public, including commercial and retail establishments." (LMF ¶ 73; JRMF ¶ 73.) SAI conducts its audits by managing "a network of independent contractors who function similar to mystery shoppers." (LMF ¶ 75; JRMF ¶ 75.) SAI itself recruits these independent contractors for auditing work. (LMF ¶ 76; JRMF ¶ 76.) When beginning a particular audit, DirecTV provides

> SAI with audit parameters and a real time current list of commercial establishments that auditors should not visit as those establishments are commercial customers which are authorized to obtain and exhibit various DirecTV commercial programming ("Commercial Subscribers List"). Audit parameters or instructions provided by DirecTV to SAI may include particular criteria for the kinds of

4

> establishments within a given time period to be included in the audit. The criteria may include, for example, whether auditors should look for commercial establishments that sell food and beverages on-site accounting for more than 60% of their revenue. A single audit might have separate sets of instructions for commercial establishments that sell food and beverages and for retail establishments that do not.

(Lonstein Decl. ¶ 15, ECF No. 175-9.) The Commercial Subscribers Lists themselves, provided by DirecTV, vary "depending on the nature of the television services the audit assignment is targeting." (*Id.* ¶ 16.) For example, "the Commercial Subscribers Lists created by DirecTV for audits of its pay-per-view services or special sports subscriptions . . . are different than the lists created for an audit of general commercial misuse of DirecTV programming." (*Id.*) LLO does not have direct access to the Commercial Subscribers Lists until approved to move forward on a particular claim. (LMF ¶ 85; JRMF ¶ 85.) The SAI auditors have access to "the Commercial Subscriber Lists electronically through SAI's 'Opticon Auditor Management Program.'" (Lonstein Decl. ¶ 22.). The SAI auditors view the list and then "select the establishments they visit for site inspections themselves. Neither SAI nor LLO assigns the auditors lists of places to audit." (*Id.* ¶¶ 23-24.) The auditors submit their findings to SAI independently. (*Id.* ¶ 25.) SAI has no knowledge of "whether the programming displayed at any given location is authorized or unauthorized." (*Id.* ¶ 26.) LLO does "not determine whether a user is or is not authorized." (*Id.* ¶ 27.) "If the auditor's findings are within the parameters of quality required by SAI and the establishment is not on the list provided by DirecTV, SAI submits the findings to DirecTV for review to make its own inquiry to determine whether the exhibition was authorized." (*Id.* ¶ 27.) "SAI sends DirecTV audit reports on a weekly basis," and "[a]uditors are paid even if there is no eventual recovery by DirecTV." (*Id.* ¶ 28.)

Once DirecTV receives the reports from SAI, DirecTV "reviews them against its own internal records in order to verify whether any of the establishments identified by SAI were not

authorized to exhibit DirecTV." (*Id.*) DirecTV then informs LLO as to which establishments it should contact regarding "improper use of DirecTV's residential products to enforce DirecTV's rights under 47 U.S.C. § 605 . . . by serving attorney demand letters, negotiating settlements, or initiating litigation." (*Id.* ¶ 29.) LLO has "never been involved with DirecTV's offering of services or its inquiry into whether a particular exhibition of DirecTV's programming was authorized." (*Id.*) LLO performs "its own due diligence" before initiating communication with any DirecTV customers, "including researching public records, identifying the owners of the businesses, reviewing business' licenses, and engaging in other attempts to obtain verification." (*Id.* ¶ 30.) After having conducted such due diligence, LLO "sends an initial inquiry letter to the potential commercial misuser requesting that it contact the firm." (*Id.* ¶ 31.) LLO sometimes "recommended that DirecTV not initiate litigation against potential commercial misusers . . . ." (*Id.* ¶ 33.) SAI received payment for each qualifying audit from DirecTV, and not from LLO. (*Id.* ¶ 37.) SAI is "not included" in discussions concerning whether DirecTV will bring suit. (*Id.* ¶ 40.)

      **C.**     **Undisputed Facts Regarding the Inspection of the Salon**

An SAI auditor entered the Salon on June 1, 2015 and "observed and recorded [the Salon's] exhibition of [DirecTV] programming." (LMF ¶ 110; JRMF ¶ 110; Site Inspection Report at *22, Exhibit D-7 to Spiegel Decl.) Plaintiff identified the Salon in pictures taken by the SAI auditor. (LMF ¶ 117 (citing Joaquin Dep. 66:20-67:10); JRMF ¶ 117.)

      **D.**     **Undisputed Facts Regarding Joaquin's Interactions with LLO**

DirecTV "cancelled Joaquin's television service" in 2015. (LMF ¶ 118; JRMF ¶ 118.) LLO sent Plaintiff a letter, dated August 6, 2015, with the purpose of providing her "an opportunity to attempt to resolve this matter through informal discussion." (LMF ¶¶ 120-22; JRMF ¶¶ 120-

22.) The August 6 letter also states that LLO is "authorized to take the necessary measures to preserve and enforce [DirecTV's] rights and remedies under federal and state law." (LMF ¶ 123; JRMF ¶ 123.) "Joaquin has not entered into any settlement or paid any settlement amount" to LLO, and "[n]either DirecTV nor LLO initiated legal proceedings against Joaquin." (LMF ¶¶ 131, 133; JRMF ¶¶ 131, 133.)

### E. Undisputed Facts Regarding Payment

Plaintiff "has not entered into any settlement or paid any settlement amount in connection with the communications initiated by LLO on behalf of DirecTV." (LMF ¶ 131; JRMF ¶ 131; Joaquin Dep. 67:24-68:9; Lonstein Decl. ¶ 45.) Plaintiff "has not paid her attorneys any money in connection with these claims or any ensuing lawsuit." (LMF ¶ 132; JRMF ¶ 132; Joaquin Dep. 70:21-71:9.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). A material fact— a fact "that might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)—raises a "genuine" dispute if "a reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 250). "[D]isputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (citation omitted). The Court will not "weigh the evidence and determine the truth of

the matter" but will determine whether a genuine dispute necessitates a trial. *Anderson*, 477 U.S. at 249.

The moving party bears the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "Once the moving party has met that threshold burden, the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to material facts.'" *Hackensack Univ. Med. Ctr. v. Xiao*, No. 17-2822, 2018 WL 2095598, at *4 (D.N.J. May 7, 2018) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial." *Id.* Any inferences "must be viewed in the light most favorable to the party opposing the motion." *Matsushita*, 475 U.S. at 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). "The court shall grant summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### III. DISCUSSION

#### A. NJRICO CLAIM

New Jersey's Legislature enacted its RICO statute in recognition "that the existence of organized crime and organized crime type activities presents a serious threat to the political, social and economic institutions of this State." N.J. Stat. Ann. § 2C:41-1.1(a). Thus, "[i]n order to safeguard the public interest," the Legislature sought to "disrupt and eliminate the infiltration of organized crime type activities which are substantial in nature into the legitimate trade or commerce of this State." N.J. Stat. Ann. § 2C:41-1.1(c). To this end, in the interest of the public, "activity which is inimical to the general health, welfare[,] and prosperity of the State and its inhabitants" is "subject to strict civil and criminal sanctions." *Id.*

8

A NJRICO claim is comprised of the following elements:

> (1) The existence of an enterprise; (2) that the enterprise engaged in or its activities affected trade or commerce; (3) that defendant was employed by, or associated with the enterprise; (4) that he or she participated in the conduct of the affairs of the enterprise; [and] (5) that he or she participated through a pattern of racketeering activity.

*Salit Auto Sales, Inc. v. CCC Info. Servs. Inc.*, No. 19-18107, 2020 WL 5758008, at *5 (D.N.J. Sept. 28, 2020) (quoting *State v. Ball*, 632 A.2d 1222, 1236 (N.J. Super. Ct. App. Div. 1993), *aff'd*, 661 A.2d 251 (N.J. 1995)). "NJRICO confers a private right of action on 'any person damaged in his business or property by reason of a violation of' NJRICO." *Salit Auto Sales*, 2020 WL 5758008, at *5 (citations omitted) (quoting N.J. Stat. Ann. § 2C:41-4(c)). With regard to the federal RICO statute, the Third Circuit has held that the conferral of standing to persons "'injured in [their] business or property' has a 'restrictive significance . . . which helps to assure that RICO is not expanded to every tort plaintiff.'" *Maio v. Aetna*, 221 F.3d 472, 483 (3d Cir. 2000) (quoting *Steele v. Hospital Corp. of Am.*, 36 F.3d 69, 70 (9th Cir. 1994) (internal citations omitted)).

Plaintiff alleges that Defendants directly or indirectly participated in a pattern of racketeering activity through the collection of unlawful debts in violation of section (a)-(d) of the NJRICO statute. (SAC ¶¶ 79-83 (citations omitted).) N.J. Stat. Ann. 2C:41-1 provides a list of crimes that may constitute "racketeering activity," including, as alleged by Plaintiff, extortion and fraudulent practices. *See* N.J. Stat. Ann. 2C:41-1(a)(1)(h), (o). The statute also incorporates "racketeering activity" as defined under 18 U.S.C. § 1961(1)(A), (B) and (D), which includes "mail fraud." *See* N.J. Stat. Ann. 2C:41-1(2); 18 U.S.C. § 1961(1)(A). N.J. Stat. Ann. 2C:41-1 defines unlawful debt as a debt:

> (1) Which was incurred or contracted in gambling activity which was in violation of the law of the United States, a state or political subdivision thereof; or (2) Which is unenforceable under state or

9

>federal law in whole or in part as to principal or interest because of the laws relating to usury.

N.J. Stat. Ann. 2C:41-1(e). The NJRICO statute "is parallel in structure and substance to the federal RICO statute, 18 U.S.C. § 1962. Because the language of the subsections in both statutes are virtually identical, New Jersey courts will 'look to federal decisions interpreting RICO,' except where they are inconsistent with the decisions of New Jersey courts." *Delzotti v. Morris*, No. 14-7223, 2015 WL 5306215, at *5 (D.N.J. Sept. 10, 2015) (quoting *Maxim Sewerage Corp. v. Monmouth Ridings*, 640 A.2d 1216, 1219 (N.J. Super. Ct. Law Div. 1993)).

Here, the "unlawful debt" that Joaquin alleges Defendants tried to collect does not constitute the type of debt whose collection is governed by the NJRICO statute. "The definition of 'unlawful debt' and its use elsewhere in the statute are indeed clear and unambiguous." *State v. Passante*, 542 A.2d 952, 957 (N.J. Super. Ct. 1987). The "unlawful debt" at issue in this case is not a gambling debt, and Plaintiff makes no assertions regarding the debt's relation to usury. By carefully applying the definition of "unlawful debt," the Court helps to assure that NJRICO is not expanded to provide racketeering liability and treble damages to litigants in an ordinary tort dispute that New Jersey's Legislature never intended to be subject to NJRICO. *Cf. Twp. of Marlboro v. Scannapieco*, 545 F. Supp. 2d 452, 458 (D.N.J. 2008) (cautioning that RICO should not be "expanded to provide a federal cause of action and treble damages to every tort plaintiff.")

Furthermore, Plaintiff's claims fail because Plaintiff has not been injured under the NJRICO statute. *See* N.J. Stat. Ann. 2C:41-4(c) ("Any person damaged in his business or property by reason of a violation of [Section] 2C:41-2 may sue . . . and shall recover threefold any damages he sustains and the cost of the suit, including a reasonable attorney's fee, costs of investigation and litigation."). Here, *Zimmerman v. HBO Affiliate Grp.*, 834 F.2d 1163 (3d Cir. 1987), is instructive. In *Zimmerman*, a cable service provider sent the plaintiffs a letter alleging illegal reception of cable

services. *Id.* at 1165-66. The letter demanded $300 as an "out of court settlement of all prior and present claims" against the plaintiff. *Id.* at 1166. In construing the federal RICO act, the Third Circuit held that "[a] plaintiff seeking recovery under RICO must allege injury 'in his business or property' caused by violation of the [a]ct." *Id.* at 1169. Because "[n]o named plaintiff claim[ed] to have paid money to the defendants as a result of the allegedly 'extortionate' letter," the Third Circuit held that the *Zimmerman* plaintiffs could not show damage to their "business or property." *Id.* at 1169-70.

Just as in *Zimmerman*, Plaintiff has not made any payments to the Defendants. Joaquin does not dispute this fact. (LMF ¶ 131; JRMF ¶131.) It is also undisputed that Plaintiff has not incurred any legal fees in pursuit of this litigation. (LMF ¶ 132; JRMF ¶ 132). Nor does the record demonstrate any other fees or expenses paid by Plaintiff in connection with Defendants' allegedly wrongful acts. Furthermore, while Plaintiff compares the instant case to *Weiss v. First Unum Life Insurance Co.*, 482 F.3d 254 (3d Cir. 2007), the comparison is inapposite. In *Weiss*, the "the losses alleged by [plaintiff] (as a result of his having had to sell his home and personal property below the property's fair market value as well as having incurred fees and penalties from the IRS) were out-of-pocket expenses fairly traceable to [defendant's] conduct, and thus qualify as an injury to property for RICO purposes." *Id.* at 258 n.2. Here, Plaintiff does not allege losses comparable to those discussed in *Weiss*. Moreover, "with respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' that is, pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Where "the nonmoving party has failed 'to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material

11

fact.'" *Xiao*, 2018 WL 2095598, at *4 (alteration in original) (quoting *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23)). This is true because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* This failure requires entry of summary judgment.

Finally, Plaintiff cites *Northeast Women's Center, Inc. v. McMonagle*, 670 F. Supp. 1300, (E.D. Pa. 1987), to support her standing to bring an NJRICO claim. She argues that in that case, the court found standing "even where the victim refused to pay the money demanded" because the plaintiff's business and property were nevertheless harmed due to the actions of the defendants. (Joaquin Opp'n Br. 23-24, ECF No. 207.) But *Northeast Women's Center* is distinguishable from the instant case with respect to alleged extortion. In that case, "there [was] evidence before the jury of four unauthorized entries into the [plaintiff's] facilities." *Northeast Women's Ctr., Inc. v. McMonagle*, 670 F. Supp. 1300, 1308 (E.D. Pa. 1987). Additionally, there was evidence "that patients and employees present during those entries were placed in fear by the nature and manner of the incidents." *Id.* at 1309. Finally, there was evidence to "suggest that the occurrence of these entries would cease if the [plaintiff] surrendered its abortion-providing services." *Id.* By contrast, nothing in the record before the Court suggests harm to Plaintiff's business resembling the harm in *Northeast Women's Center*, such as acts by Defendants that placed Plaintiff, her employees, or customers in fear, or that otherwise attempted to shut down her business. Plaintiff's citation to *Desmond v. Siegel*, No. 10-5562, 2012 WL 3228681, at *19-22 (D.N.J. Aug. 6, 2012) is similarly unavailing. (*See* Joaquin Opp'n Br. 24.) The instant case is distinguishable from *Desmond* because in the latter, the defendants allegedly created a website containing "numerous harassing and abusive statements," including that plaintiff was "a rapist." *Desmond*, 2012 WL 3228681, at

*4-5. The court found that the plaintiff had adequately pled "economic losses in the hundreds of thousands of dollars engaging in remedial action" to investigate and block the defendant's conduct and remove the website. *Id.* at *7. Nothing in the record demonstrates comparable out of pocket costs to Plaintiff. And while the plaintiff in *Desmond* had out of pocket legal fees associated with the alleged racketeering activity, here, it is undisputed that Joaquin does not.

## IV. CONCLUSION

For the reasons stated above, Defendants' Motions for Summary Judgment are granted. All claims as to the Lonstein Defendants and Signal Defendants (Count Two) are dismissed with prejudice. An order consistent with this Memorandum Opinion will be entered.

*/s/ M. Shipp*
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**